AO 106 (Rev. 04/10) Application for a Search Warrant



FILED

APR - 9 2024

CLERK U.S. DISTRICT COURT
NEWPORT NEWS, VA

# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)    Case No.  4:24-sw-56
janilecarney@gmail.com, hennidabrat@gmail.com, )
jacksonacacia2004@gmail.com, )
jayquan0123@gmail.com, jamicalangley@gmail.com )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1201(c) | conspiracy to commit kidnapping |
| 18 USC 1201(a)(1) | kidnapping resulting in death |

The application is based on these facts:

See attached affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA

_____
Mack Coleman / Lisa McKeel

_____
Applicant's signature

Daniel F. Woloszynowski II, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____04/09/2024_____

_____
Judge's signature

City and state:  Newport News, Virginia

Robert J. Krask, U.S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>    4:24-sw-____ | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____                    _____
                                                            *Executing officer's signature*

                                                            _____
                                                                        *Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE EMAIL ADDRESSES JANILECARNEY@GMAIL.COM, HENNIDABRAT@GMAIL.COM, JACKSONACACIA2004@GMAIL.COM, JAYQUAN0123@GMAIL.COM AND JAMICALANGLEY@GMAIL.COM WITHIN THE POSSESSION, CUSTODY, OR CONTROL OF GOOGLE LLC | No. 4:24-sw-____ |

## AFFIDAVIT IN SUPPORT OF PROBABLE CAUSE

I, Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agent, Daniel "Dan" Woloszynowski II, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with the email addresses **JANILECARNEY@GMAIL.COM** ("**TARGET ACCOUNT 1**"), **HENNIDABRAT@GMAIL.COM,** ("**TARGET ACCOUNT 2**"), **JACKSONACACIA2004@GMAIL.COM** ("**TARGET ACCOUNT 3**"), **JAMICALANGLEY@GMAIL.COM** ("**TARGET ACCOUNT 4**"), and **JAYQUAN0123@GMAIL.COM** ("**TARGET ACCOUNT 5**" and collectively the "**TARGET ACCOUNTS,**") that is stored at premises owned, maintained, controlled, or operated by Google LLC ("Google"), a provider of electronic services and/or remote computing service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California.

2.      The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3.      I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), and have been since May of 2022. I have completed in excess of 400 hours of instruction at the Federal Law Enforcement Training Center in Glynco, Georgia and graduated from

1

the Criminal Investigator Training Program and the ATF National Academy, Special Agent Basic Training.

4.      As a SA with ATF, I am a federal law enforcement officer as described in 18 U.S.C. § 2510(7). I am responsible for investigating and enforcing violations of federal law in accordance with 18 U.S.C. § 3051. As an ATF SA assigned to the Newport News Field Office, I have investigated individuals for illegal possession and use of firearms, illegal possession, and distribution of controlled substances, and for committing violent crimes. In the course of those investigations, I have executed arrest warrants, conducted physical and electronic surveillance, executed search warrants, and seized and reviewed evidence. I have conducted investigations for a variety of violations of federal and state law, including cyber investigations, investigations involving the purchase of contraband via the internet, and a variety of offenses involving firearms, violent offenses, and criminal organizations. I have also interviewed witnesses and victims and have worked with cooperating individuals.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information I have obtained, either directly or indirectly, from witnesses, my review of records and documents, and information obtained from other law enforcement officers and agents. I have not included each and every fact that my investigation has revealed, but rather, have included only those facts necessary to show probable cause at time of this affidavit therein. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on the facts set forth in this Affidavit, there is probable cause to believe that **HEZEKIAH CARNEY** ("CARNEY"), **DONNISHA GOODMAN** ("GOODMAN"), **ACACIA JACKSON** ("JACKSON"), **JAYQUAN JONES** ("JONES"), and **JAMICA LANGLEY** ("LANGLEY" and collectively, the "defendants"), have violated 18 U.S.C. § 1201(c) (Conspiracy to Commit Kidnapping) and 18 U.S.C. § 1201(a)(1) (Kidnapping Resulting in Death). There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

7.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND CONCERNING GOOGLE AND RELEVANT TECHNOLOGY

8.      Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

2

9.      In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

10.      Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account. Google advertises its services as using just one account to access all of its services. Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below (retention varies based on type of service, user behavior, and date of account creation).

a.      **Gmail**: Google provides email services (called Gmail) to Google Accounts through email addresses at gmail.com or enterprise email addresses hosted by Google. Gmail can be accessed through a web browser or a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user. Google preserves emails associated with a Google Account indefinitely, unless the user deletes them.

b.      **Contacts**: Google provides an address book for Google Accounts through Google Contacts. Google Contacts stores contacts the user affirmatively adds to the address book, as well as contacts the user has interacted with in Google products. Google Contacts can store up to 25,000 contacts. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group. Users have the option to sync their Android mobile phone or device address book with their account so it is stored in Google Contacts. Google preserves contacts indefinitely, unless the user deletes them. Contacts can be accessed from the same browser window as other Google products like Gmail and Calendar.

c.      **Calendar**: Google provides an appointment book for Google Accounts through Google Calendar, which can be accessed through a browser or mobile application. Users can create events or RSVP to events created by others in Google Calendar. Google Calendar can be set to generate reminder emails or alarms about events or tasks, repeat events at specified intervals, track RSVPs, and auto-schedule appointments to complete periodic goals (like running three times a week). A single Google Account can set up multiple calendars. An entire calendar can be shared with other Google Accounts by the user or made public so anyone can access it. Users have the option to sync their mobile phone or device calendar so it is stored in Google Calendar. Google preserves appointments indefinitely, unless the user deletes them. Calendar can be accessed from the same browser window as other Google products like Gmail and Calendar.

d.      **Messaging**: Google provides or has provided several messaging services including Duo, Messages, Hangouts, Meet, and Chat. These services enable real-time text, voice,

3

and/or video communications through browsers and mobile applications, and also allow users to send and receive text messages, videos, photos, locations, links, and contacts. Google may retain a user's messages if the user hasn't disabled that feature or deleted the messages, though other factors may also impact retention. Google does not retain Duo voice calls, though it may retain video or voicemail messages.

e.      **Drive/Keep**: Google Drive is a cloud storage service automatically created for each Google Account. Users can store an unlimited number of documents created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides, (Google's presentation program). Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage limit. Users can set up their personal computer or mobile phone to automatically back up files to their Google Drive Account. Each user gets 15 gigabytes of space for free on servers controlled by Google and may purchase more through a subscription plan called Google One. In addition, Google Drive allows users to share their stored files and documents with up to 100 people and grant those with access the ability to edit or comment. Google maintains a record of who made changes when to documents edited in Google productivity applications. Documents shared with a user are saved in their Google Drive in a folder called "Shared with me." Google preserves files stored in Google Drive indefinitely, unless the user deletes them. Google Keep is a cloud-based notetaking service that lets users take notes and share them with other Google users to view, edit, or comment. Google Keep notes are stored indefinitely, unless the user deletes them.

f.      **Photos**: Google offers a cloud-based photo and video storage service called Google Photos. Users can share or receive photos and videos with others. Google Photos can be trained to recognize individuals, places, and objects in photos and videos and automatically tag them for easy retrieval via a search bar. Users have the option to sync their mobile phone or device photos to Google Photos. Google preserves files stored in Google Photos indefinitely, unless deleted.

g.      **Maps**: Google offers a map service called Google Maps which can be searched for addresses or points of interest. Google Maps can provide users with turn-by-turn directions from one location to another using a range of transportation options (driving, biking, walking, etc.) and real-time traffics updates. Users can share their real-time location with others through Google Maps by using the Location Sharing feature. And users can find and plan an itinerary using Google Trips. A Google Account is not required to use Google Maps, but if users log into their Google Account while using Google Maps, they can save locations to their account, keep a history of their Google Maps searches, and create personalized maps using Google My Maps. Google stores Maps data indefinitely, unless the user deletes it.

h.      **Location History**: Google collects and retains data about the location at which Google Account services are accessed from any mobile device, as well as the periodic location of Android devices while they are in use. This location data can derive from a range of sources, including GPS data, Wi-Fi access points, cell-site locations, geolocation of IP addresses, sensor data, user searches, and Bluetooth beacons within range of the device. According to Google, this location data may be associated with the Google Account signed-in or registered to the device when Location

4

Services are activated on the device and the user has enabled certain global settings for their Google Account, such as Location History or Web & App Activity tracking. The data retained may be both precision location data, like latitude and longitude coordinates derived from GPS, and inferential location data, such as the inference that a Google Account is in New York because it conducts a series of searches about places to eat in New York and directions from one New York location to another. Precision location data is typically stored by Google in an account's Location History and is assigned a latitude-longitude coordinate with a meter radius margin of error. Inferential data is stored with an account's Web & App Activity. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes it or opts to automatically delete their Location History and Web & App Activity after three or eighteen months. Accounts created after June 2020 auto-delete Location History after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

i.      **Pay/Wallet**: A subsidiary of Google, Google Payment Corporation, provides Google Accounts an online payment service called Google Pay (previously Google Wallet), which stores credit cards, bank accounts, and gift cards for users and allows them to send or receive payments for both online and brick-and-mortar purchases, including any purchases of Google services. Users may delete some data associated with Google Pay transactions from their profile, but Google Payment Corporation retains some records for regulatory purposes.

j.      **Chrome/My Activity**: Google offers a free web browser service called Google Chrome which facilitates access to the Internet. Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access. If a user is logged into their Google Account on Chrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account in a record called My Activity. My Activity also collects and retains data about searches that users conduct within their own Google Account or using the Google Search service while logged into their Google Account, including voice queries made to the Google artificial intelligence-powered virtual assistant Google Assistant or commands made to Google Home products. Google also has the capacity to track the websites visited using its Google Chrome web browser service, applications used by Android users, ads clicked, and the use of Google applications by iPhone users. According to Google, this search, browsing, and application use history may be associated with a Google Account when the user is logged into their Google Account on the browser or device and certain global settings are enabled, such as Web & App Activity. Google Assistant and Google Home voice queries and commands may also be associated with the account if certain global settings are enabled, such as Voice & Audio Activity tracking. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes them or opts in toautomatic deletion of their location history every three or eighteen months. Accounts created after June 2020 auto-delete Web & App Activity after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

k.      **Play**: Google Accounts can buy electronic media, like books, movies, and music, and mobile applications from the Google Play Store. Google Play records can include records

5

of whether a particular application has been or is currently installed on a device. Users cannot delete records of Google Play transactions without deleting their entire Google Account.

l.      **Voice**: Google offers a service called Google Voice through which a Google Account can be assigned a telephone number that can be used to make, record, and forward phone calls and send, receive, store, and forward SMS and MMS messages from a web browser, mobile phone, or landline. Google Voice also includes a voicemail service. Records are stored indefinitely, unless the user deletes them.

m.      **YouTube**: Google also offers a video platform called YouTube that offers Google Accounts the ability to upload videos and share them with others. Users can create a YouTube channel where they can upload videos, leave comments, and create playlists available to the public. Users can subscribe to the YouTube channels of others, search for videos, save favorite videos, like videos, share videos with others, and save videos to watch later. More than one user can share control of a YouTube channel. YouTube may keep track of a user's searches, likes, comments, and change history to posted videos. YouTube also may keep limited records of the IP addresses used to access particular videos posted on the service. Users can also opt into a setting to track their YouTube Watch History. For accounts created before June 2020, YouTube Watch History is stored indefinitely, unless the user manually deletes it or sets it to auto-delete after three or eighteen months. For accounts created after June 2020, YouTube Watch History is stored for three years, unless the user manually deletes it or sets it to auto-delete after three or eighteen months.

11.     Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail can be saved directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings. When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

12.     Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services used by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP

6

addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

13. Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

14. According to Google's Privacy & Terms website, the company sends a small piece of text (known as a "cookie") to the user's Internet browser for a variety of purposes. Cookies allow the websites visited, such as Google.com or Gmail.com, to recognize the electronic device that is accessing that website. Google's cookies record: (a) all of the Google accounts accessed by a particular electronic device using the same web browser; (b) information about those visits; and b(c) the user's preferences and other settings. When that device returns to the website later, Google can then tailor the user's online experience accordingly. Through the use of these cookies, Google is able to establish a relationship between Google accounts that are used by the same individual.

15. As explained herein, information stored in connection with a Google account, including evidence of who was using a Google account, when, and from where, and may provide crucial evidence to establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

a. Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

b. Other information connected to the use of a Google account may lead to the discovery of additional evidence. For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators, to further the scheme or to move or launder ill-gotten proceeds or to pay for firearms purchased illicitly (like Zelle, Venmo, CashApp). In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

c. Further, the user's account activity, logs, stored electronic communications, and other data retained by Google may reveal "user attribution" evidence analogous to "indicia of occupancy" evidence sought when executing a search warrant at a residence. This information indicates who has used or controlled the account at the relevant time, like email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time). Further, information like IP address logs and location data can show how, when, and where the

7

account was accessed or used. This information taken altogether can help investigators understand the chronological and geographic context of the email account access and use relating to the crime under investigation, which may tend to either inculpate or exculpate the owners of accounts like the TARGET ACCOUNTS.

d.    Finally, data from the TARGET ACCOUNTS may provide relevant insight into the state of mind of its users or owners as it relates to the offense under investigation. Emails or other messages may indicate the owner's motive and intent to commit a crime, and other evidence can show consciousness of guilt (e.g., deleting communications to conceal them from law enforcement).

16.    Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## PROBABLE CAUSE

### A.    Background

17.    Federal law enforcement agencies, including ATF and the Federal Bureau of Investigations ("FBI") as well as state and local law enforcement agencies (hereinafter, the "investigative team") have been investigating the May 6, 2023, murder of T.M., who was affiliated with a criminal street gang called the Black P. Stones, amongst other things.[1]

### B.    The May 6, 2023, Murder of T.M.

18.    On or about May 6, 2023, at approximately 6:30 a.m., a resident of York County, Virginia, called 911 after identifying what appeared to be a person lying in the woods off of Old Williamsburg Road.

19.    Members of the York-Poquoson Sheriff's Office ("YPSO") responded to the complaint and discovered a deceased black female laying in the wood line off of Old Williamsburg Road near the cross street of Daniels Drive, in York County.  The female was found without shoes on, nor was the female wearing a bra.

20.    York County is within the Eastern District of Virginia.

---

[1] On December 18, 2023, the United States charged Acacia Jackson and Donnisha Goodman by complaint with conspiracy to commit kidnapping and kidnapping resulting in death.  On January 16, 2024, the grand jury returned an indictment charging Jackson and Goodman with these offenses. On March 5, 2024, Jackson pleaded guilty to conspiracy to commit kidnapping.  The investigation is ongoing with respect to Goodman and the remaining coconspirators.

21.    Members of the YPSO canvassed the area around the crime scene for information about the crime. A resident reported hearing several gunshots at approximately 3:47 a.m.

22.    Members of the YPSO determined the identity of the victim to be T.M., with a last known address of an apartment located at **** Bethel Street, Richmond, Virginia.

23.    Members of the YPSO collected 14 total 9mm cartridge casings with the headstamp "S&B" from the scene.

24.    A subsequent autopsy conducted by the Office of the Chief Medical Examiner for the Commonwealth of Virginia found that T.M. suffered eight gunshot entry wounds.

25.    According to the Medical Examiner, T.M.'s cause of death was determined to be multiple gunshot wounds, and the manner of death was found to be homicide.

26.    Members of the YPSO initiated an investigation into the homicide. They interviewed friends and family members of T.M.

27.    Members of the YPSO also obtained video footage from relevant businesses near the scene of the homicide and near T.M.'s residence, reviewed T.M.'s social media accounts, and searched T.M.'s apartment pursuant to a state authorized search warrant.

C.    **Surveillance Video Footage from the Vicinity of T.M.'s Residence**

28.    Members of the YPSO collected video footage from outside T.M.'s apartment on the evening of May 5, 2023, through the morning of May 6, 2023.

29.    I reviewed surveillance footage showing that at approximately 1:08 a.m. on May 6, 2023, a dark-colored sedan with a defect in the right taillight arrived at T.M.'s residence. The footage further revealed that, at approximately 1:14 a.m., four subjects exited the sedan and walked towards T.M.'s residence on Bethel Street. At approximately 1:38 a.m., multiple subjects departed the area in the dark colored sedan with the taillight defect.

30.    I have also reviewed surveillance footage showing that at approximately 2:28 a.m., the dark-colored sedan with the taillight defect returned. After parking, five individuals exited the vehicle and approached T.M.'s residence.

31.    I reviewed surveillance footage showing that members of the group entered T.M.'s residence. Simultaneously, five individuals and T.M. departed the area in the dark colored sedan with the taillight defect, while a male individual wearing a white undershirt appeared to have fled the area.

9

**D.    Investigators Identified a Black Hyundai Sonata Used in the Crime**

32.    Members of the Richmond Police Department ("RPD") identified a vehicle of interest by comparing license plate readers in the area around T.M.'s residence with the timing of the arrivals and departures of the dark colored sedan with taillight defect observed on the aforementioned surveillance videos.

33.    Members of RPD confirmed the vehicle of interest was a black Hyundai Sonata sedan bearing Virginia license plate ending in 9340.

34.    Members of the YPSO conducted a check with the Virginia Department of Motor Vehicles, which revealed that Donnisha GOODMAN ("GOODMAN") was the registered owner of the Hyundai sedan.

35.    Law enforcement issued a statewide "Be On the Lookout" for the vehicle.

**E.    Surveillance Video Footage on the Route to the Scene of the Murder**

36.    Members of the YPSO also collected surveillance video from local businesses near the scene of the murder in York County.  According to reports from YPSO, footage from W & J Auto Repair, located at **** Jefferson Avenue, in Newport News showed that the Hyundai sedan with the taillight defect arrived at an adjacent 7-Eleven gas station at approximately 3:29 a.m.

37.    Members of the YPSO collected additional footage from inside the 7-Eleven gas station, located at ***** Jefferson Avenue, Newport News, and identified two individuals believed to be LANGLEY and her brother, co-conspirator Jayquan JONES ("JONES"), who entered the store and paid for items with cash.

38.    From inside the 7-Eleven store, video surveillance shows a woman who matches LANGLEY's appearance entered at around 3:32 a.m. and briefly interacted with an employee at the register.  The woman was holding a white purse with a black chain.  She left the store about thirty seconds later, was seen standing in the parking lot outside the store door, and returned at 3:33 a.m. with a mask covering the lower half of her face.  A man matching JONES's appearance entered the store about thirty seconds later, and stood next to LANGLEY as she continued to interact with the store employee at the register.  There is no audio with the surveillance video.

39.    The surveillance video inside the 7-Eleven shows JONES and LANGLEY leaving the store without appearing to purchase anything at 3:34 a.m. and walk toward the area where the Sonata was parked.  JONES and LANGLEY enter the store one more time at 3:35 a.m., at which point LANGLEY no longer appears to be wearing a face mask, and about ten seconds later LANGLEY can be seen putting her face mask back on.  LANGLEY purchases what appears to be cigarettes using change and she and JONES depart the store for a final time just before 3:37 a.m.

10

40.     The footage showed that the Hyundai sedan with the taillight defect departed at approximately 3:38 a.m., heading east on Route 238, toward Old Williamsburg Road and the scene of the murder.  The 7-Eleven gas station at ***** Jefferson Avenue is approximately 3.6 miles from the scene of the murder and over fifty miles from Bethel Street.

41.     Members of the YPSO also collected and reviewed video surveillance from the Yorktown Revolutionary War Museum at *** Water Street, which showed a dark-colored sedan drive to the building entrance approaching from the area of Old Williamsburg Road, and make a U-Turn to return to Old Williamsburg Road at approximately 3:44 a.m.  The angle of the video surveillance and intervening vegetation prevent me from analyzing the vehicle's taillights.  The Yorktown Revolutionary War Museum is less than a mile from the scene of the murder.

42.     Members of the YPSO collected video surveillance from an Exxon located at **** New Kent Highway in Quinton, Virginia, which is between Yorktown and Richmond.  That footage revealed a dark-colored Hyundai sedan with taillight defect arrive at approximately 4:32 a.m.  After waiting for a customer at an adjacent pump to leave, a black male wearing a white shirt and what appears to be a black mask, believed to be co-conspirator CARNEY exits the driver side passenger door and begins pumping gas.  When he is finished, he opens the driver's door.  A black female with long, straight, blue hair wearing a black and white hat exits the driver's position in the vehicle, and changes places with Carney.  The vehicle then departs the gas station at approximately 4:42 a.m.  The Exxon gas station is approximately 46 miles from the scene of the murder.

**F.     Surveillance Video Footage at the Scene of the Murder**

43.     Members of the YPSO collected video surveillance from residences and a church located in the general vicinity of Old Williamsburg Road.  The relative rural setting of the crime scene, coupled with the specific locations of the residences and church, resulted in no relevant video surveillance.

**G.     Investigators Recovered the Hyundai Sonata**

44.     On May 7, 2023, at approximately 5:29 a.m. in Norfolk, Virginia, Norfolk Police located and stopped the Hyundai Sonata registered to GOODMAN.  I have reviewed the police report for this traffic stop, which noted that LANGLEY, GOODMAN, and co-conspirator JACKSON were present in the vehicle.

45.     Members of the YPSO then obtained and executed a search warrant for the Hyundai Sonata.  According to a YPSO report, among the items found in the vehicle were a 9 mm cartridge with the headstamp "S&B," multiple cellular phones, and a black face mask. They also recovered a white purse on a black chain, that contained several prescriptions for medications written for LANGLEY dated from May 5, 2023.  The purse was visually consistent with the one seen with LANGLEY on the 7-Eleven surveillance footage discussed in paragraph 43.

11

46.    I reviewed the shape and features of the black Hyundai Sonata identified by members of the RPD and compared it to the dark colored sedan with the taillight defect reviewed from surveillance footage in the vicinity of T.M.'s residence. The dark colored sedan appears to be the Hyundai Sonata identified herein.

## H.    Arrest of Targets

47.    On May 10, 2023, members of law enforcement conducted surveillance on addresses of the suspects involved in T.M.'s murder, including *** Green Street in Portsmouth, Virginia, an address believed to be associated with GOODMAN.

48.    A member of YPSO observed a male and three females exit the building located at *** Green Street, and recognized them as LANGLEY, GOODMAN, JACKSON, and CARNEY. Law enforcement arrested LANGLEY, JACKSON, and CARNEY on outstanding arrest warrants for the murder of T.M. Goodman was released because they did not yet have a warrant for her arrest.[2]

49.    When CARNEY was arrested, PPD officers found a firearm in his waistband and eighteen small baggies of suspected narcotics from CARNEY's front left pocket. The firearm recovered from CARNEY has been forensically examined by the Virginia Department of Forensic Science, and it was eliminated as having fired the cartridge cases found at the scene of T.M.'s murder. CARNEY's firearm did, however, have similar rifling-class characteristics like a bullet found in T.M.'s body during her autopsy.

50.    On May 11, 2023, JONES called law enforcement, stating that he wanted to turn himself in. Members of the RPD went to JONES' mother's house in Richmond, where they arrested JONES. During the arrest, individuals at the home shouted at JONES not to say anything and JONES replied, "see you in a few years." When JONES was arrested, he was not in possession of a cellular telephone device.

51.    JONES later asked for an attorney and declined to speak with members of the RPD.

52.    Goodman turned herself in pursuant to an arrest warrant at the Portsmouth Police Department on June 12, 2023. She declined to speak with law enforcement.

## I.    Information Obtained to Date from Phone Records and Searches of Cellular Phones

53.    YPSO investigators obtained call detail records ("CDR") including cell-site location information ("CSLI") and more precise location data known as Timing Advance records ("TA") or Historical Precision Location Information ("HPLI") pursuant to search warrants from the respective service providers for the cellular telephones used by CARNEY, GOODMAN, and JACKSON.

---

[2] At that time, YPSO was still waiting for outstanding cell phone location information for Goodman's phone. Once they received the information described in further detail below, they obtained an arrest warrant for Goodman.

12

Additionally, location data was extracted from cellular telephones seized from CARNEY, GOODMAN, JACKSON, and LANGLEY and forensically examined pursuant to search warrants. This location information puts the cellular phones for the defendants in the vicinity of the gang-related "beating," the later abduction of T.M. from her, and the scene of the murder, as described in further detail below.

        a.      <u>LANGLEY</u>

54.    A forensic extraction for the cellular telephone associated with LANGLEY showed that it was traveling on Interstate 64 towards Richmond around midnight on the morning of May 6, 2023. These location points coincide with the location data associated with CARNEY and GOODMAN, which show all three traveling to Richmond at the same time. Between 2:23 a.m. and 2:24 a.m., the location data for LANGLEY's cellular telephone shows that it was in the area of LANGLEY's and JONES' residence at **** St. James Street in Richmond. From 2:28 a.m. to 2:36 a.m., the location data further showed LANGLEY's cellular telephone in the area of T.M.'s residence located at **** Bethel Street in Richmond. At 2:38 a.m., LANGLEY's location data indicated that her cellular phone was in the Mosby Court housing development located just south of T.M.'s residence.

55.    A few hours later, at 4:43 a.m., the next location data showed LANGLEY's cellular telephone approximately less than mile west of the Exxon gas station located at **** New Kent Highway in Quinton. The cellular telephone seemed to be traveling on Interstate 64 West, as there were a total of seven location points moving towards the Richmond area. Between 5:29 a.m. and 5:34 a.m., LANGLEY's cellular telephone appeared to be in the area of LANGLEY's and JONES' residence at **** St. James Street in Richmond.

        b.      <u>JONES</u>[3]

56.    Law enforcement has reason to believe that JONES was using a cellular device at the time of the homicide ending in the last four digits 5825. Your affiant has obtained a federal search warrant for CSLI data associated with that number on March 18, 2024. The return from the telephone service provider is still pending.

57.    An analysis of the CDRs for the cellular phone believed to have been used by JONES reflects frequent contact in the form of text messages and phone calls between himself, his co-conspirators, and T.M. in the months and days leading up to the murder. The CDRs for the phone linked to JONES reflects that the only activity on May 6, 2023, prior to T.M. being murdered, were two incoming unanswered calls from JACKSON at 1:41 a.m. and 1:42 a.m. The next activity on the phone linked to JONES was at 4:47 a.m., which was the beginning of the text

---

[3] While investigators have obtained CDRs for a telephone number associated with JONES, the records do not contain any CSLI and law enforcement is no longer able to obtain TA records, which are only stored for a limited amount of time.

conversation with JACKSON discussed in paragraph 80.

    c.    <u>JACKSON</u>

58. As noted above, members of the YPSO recovered JACKSON's cellular telephone during the May 7, 2023, traffic stop and search of the Hyundai Sonata. Members of the YPSO obtained CDRs with CSLI and TA records associated with a telephone number subscribed to JACKSON. Notably, JACKSON made three outgoing calls to T.M.'s telephone number on May 6, 2023, once at 1:10 a.m. and two times at 1:15 a.m., but it appears that the calls were not answered.

59. From 1:08 a.m. to 1:39 a.m. on May 6, 2023, JACKSON's cellular telephone appeared to be in the area of T.M.'s residence located at **** Bethel Street, Richmond, Virginia. From 1:46 a.m. to 2:23 a.m., JACKSON's cellular telephone appeared to leave that area and move to the area of **** St. John Street, where LANGLEY and JONES live. From 2:27 a.m. to 2:34 a.m., JACKSON's cellular telephone moved back towards T.M's residence. At 2:36 a.m., JACKSON's cellular telephone left the area of T.M.'s residence and moved eastbound on Interstate 64 towards York County, Virginia. From 3:07 a.m. to 3:40 a.m., JACKSON's cellular telephone had no record of location data.

60. At 3:40 a.m., JACKSON's cellular telephone was in the vicinity of Yorktown Road and Jefferson Avenue in Newport News, which is close to the 7-Eleven mentioned in paragraphs 38-41, and then traveled down Yorktown Road and crossed into York County to where Yorktown Road changes to Old Williamsburg Road. At 3:42 a.m., JACKSON's cellular telephone was in the vicinity of Browns Lane and Old Williamsburg Road, which is approximately 1.58 miles or approximately a three-minute drive away from where T.M. was murdered.

61. From 3:51 a.m. to 3:59 a.m., JACKSON's cellular telephone appeared to be moving westbound on Interstate 64, away from the crime scene on Old Williamsburg Road. From approximately 4:31 a.m. to 4:41 a.m., JACKSON's cellular telephone left the interstate and appeared to be in the vicinity of the Exxon gas station mentioned above. From 4:41 a.m. to 4:55 a.m., JACKSON's cellular telephone continued westbound on Interstate 64 into Richmond.

    d.    <u>CARNEY</u>

62. CARNEY was in possession of his cellular telephone at the time of his arrest on May 10, 2023. Members of the YPSO obtained CDRs with CSLI and TA records for the telephone number associated with the phone recovered from CARNEY's person during his arrest. From 1:08 a.m. to 1:41 a.m. on May 6, 2023, CARNEY's cellular telephone appeared to be in the area of T.M.'s residence. From 1:46 a.m. to 2:24 a.m., CARNEY's cellular telephone appeared to leave that area and move to the area where LANGLEY and JONES live. From 2:26 a.m. to 2:34 a.m., CARNEY's cellular telephone moved back towards T.M.'s residence and at 2:36 a.m., CARNEY's cellular telephone left the area of T.M.'s residence and traveled eastbound on Interstate 64 towards York County, Virginia.

14

63.     About an hour later, at 3:32 a.m., CARNEY's cellular telephone was in the vicinity of Yorktown Road and Jefferson Avenue in Newport News, which is close to the 7-Eleven mentioned above and within 3.04 miles of where T.M. was murdered.  There was no more activity from CARNEY's cellular telephone until 7:06 a.m. on May 6, 2023, when the HPLI for CARNEY's cellular telephone showed that it was in Virginia Beach, Virginia.

e.     GOODMAN

64.     Members of the YPSO obtained CDRs with CSLI and HPLI records for a telephone number associated with GOODMAN and seized from her during the traffic stop of the Sonata on May 7, 2023. GOODMAN was in possession of her cellular telephone when GOODMAN was stopped by law enforcement on May 7, 2023.  From 1:06 a.m. to 1:42 a.m. on May 6, 2023, GOODMAN's cellular telephone appeared to be in the area of T.M.'s apartment on Bethel Street. From 1:45 a.m. to 2:23 a.m., GOODMAN's cellular telephone appeared to leave that area and move to the area of where LANGLEY and JONES lived.  From 2:25 a.m. to 2:36 a.m., GOODMAN's cellular telephone moved back towards T.M.'s residence.  At 2:37 a.m., GOODMAN's cellular telephone left the area of T.M.'s residence and traveled eastbound on Interstate 64 towards York County.

65.     On May 6, 2023, between 3:30 a.m., and 3:40 a.m., GOODMAN's cellular telephone was in the vicinity of Yorktown Road and Jefferson Avenue in Newport News, close to the 7-Eleven mentioned above.  The phone then traveled down Yorktown Road and crossed into York County, to where Yorktown Road changes to Old Williamsburg Road.  At 3:44 a.m., GOODMAN's cellular telephone was within .88 miles of where T.M. was murdered.  From 3:50 a.m. to 3:56 a.m., GOODMAN's cellular telephone appeared to be moving westbound on Interstate 64, away from the crime scene on Old Williamsburg Road.  From approximately 4:30 a.m. to 4:33 a.m., GOODMAN's cellular telephone left the interstate and appeared to be in the vicinity of the Exxon gas station mentioned above.  From 4:43 a.m. to 4:54 a.m., GOODMAN's cellular telephone continued moving westbound on Interstate 64 into Richmond.

J.     **Cooperating Witnesses**

66.     Members of the investigative team, including myself, have interviewed Cooperating Witness 1 (hereinafter CW-1), Cooperating Witness 2 (hereinafter CW-2), and Cooperating Witness 3 (CW-3).  The following paragraphs include some of the information obtained during those interviews.

67.     During the early morning hours of May 6, 2023, T.M. told CW-1 that she had just been attacked by three female members of the gang while a male member watched.

68.     CW-1 knew T.M. to be in a gang, understood she carried the title, "First Lady," and believed she was required to attend meetings in Norfolk, Virginia.

15

69.     On May 5, 2023, T.M. spent the day with her friend, CW-2. CW-2 overheard a phone conversation in which T.M. said that several members of her gang were coming to "jump her out" earlier in the week, but they got a flat tire and were unable to make it to Richmond.

70.     On May 5, 2023, T.M. further told CW-2 that she expected members of the organization to try again, and this worried her. She added that if they are coming to get her, then she is going to be beaten out in a "body bag."

71.     On the morning of May 6, 2023, at approximately 1:58 a.m., after the first attack, T.M. sent CW-2 a Facebook message containing photographs of T.M.'s injuries that T.M. and stating that "they banked" her.

72.     CW-3 was a participant in the kidnapping conspiracy. She provided sworn testimony that CARNEY, GOODMAN, JONES, and LANGLEY were the other individuals responsible for the kidnapping and murder of T.M. CW-3 further confirmed that GOODMAN used a GPS navigation application on her phone to drive from Richmond to the scene of the murder.

## K.     Data and Communications from Phone Extractions

73.     Law enforcement obtained a state search warrant for the contents of JACKSON's cellular telephone and conducted a forensic data extraction from the phone. The search of the phone's contents revealed a group chat created by CARNEY that had nineteen participants, including phone numbers associated with GOODMAN, LANGLEY, JONES, and T.M.

74.     On April 25, 2023, CARNEY sent a text message entitled "Almighty Black P. Stone Nation," with a "head kount" containing the names of regional gang sets and local leaders. For the "Blakk Stone Gorillas" set, the text message lists "HK" as the top "Krown Prinxe," with "Baretta," the monicker associated with T.M., "Lady Henny," the monicker associated with GOODMAN, and "Baby D," the monicker associated with LANGLEY," all listed under HK's leadership. "Dominant," the monicker associated with JACKSON, was listed under the "NYC Blakk Stone Gorillas" heading. CARNEY's next text message to the group lists "Baretta" as the "Krown Princess" of the "Vietnam Blakk5stone Gorillas 'Tribe,'" "Lady Henny" as the "First Lady" of the region encompassing the Hampton Roads area, "Baby D" as the "First Lady" of the region encompassing the Richmond area, and "Dominate" as the "First Lady" of the New York City region.

75.     From my training and experience, I am aware that gangs associated with the Bloods will avoid using the letter "c" in communications, as a result of their rivalry with the Crips. This practice is consistent with much of the content recovered from their targets on these cellular devices.

76.     A data extraction from the cellular telephone linked to JONES revealed a group chat labeled "ABPSN" with sixteen participants, including CARNEY, JACKSON, LANGLEY, and T.M. On September 20, 2022, HK sent the group a text labeled "Konstitution" that outlined the creed of the Black P. Stones, as well as the "Stone Motto" and "Oath" for gang members. A subsequent text from CARNEY elaborated on the "World Wide History" of the Black P. Stones, describing the

16

founding of the Black P. Stone Nation in 1954 in Chicago. CARNEY then sent a "Memo" dated from December 23, 2021, describing several rules, including that "Kommunication is a must. Constant communication is necessary for each other's safety," and "ALL orders will be followed. Any command that's given shall not be ignored, if so you will be exiled and put on a plate."

77.    Texts in the ABPSN group chat discuss the best means of communication to evade the "feds" and law enforcement, with CARNEY "loving" a message on September 20, 2022, stating "'Telegram is made by fb' Only thing that's safe is Facetime any social communication over these lines be dead fr i barely even like being in the gc tbh but i aint eva heard of signal." CARNEY then replied, "Moreless People got to no & Understand tho as well like this is still a Gang / Organization that dem white ppl gone look at us even tho we ain't out here on no Wild dumb shit everybody got lane & Wave dat they generating some money in but y'all have to still understand on what kome with this shit beef / Might b Time or Ect feel me Kuz my Big Homie when I was Mad Stone Died for this sht . . . " JACKSON replied, "IM HERE TILL THE END." CARNEY then texted "A mandatory monthly fund of 21$ must be contributed to a fund that will be utilized for the goals and needs of the BPSN B-Line."

78.    Texts from the day before the homicide corroborate CW-1 and CW-2's testimony that members of the gang were planning to beat T.M. out of the gang but were prevented from doing so by a flat tire. JACKSON's cellular telephone texted T.M. about JACKSON and others coming to T.M.'s apartment, stating "we otw to yah shii." At 10:43 p.m., JACKSON says, "Her tire got flat," to which T.M. responded "What's t? Kause this shit out of the blue. Don't beat round the bush. SAY WHAT IT ID AND WHAT IT AINT." JACKSON replied, "Wym what's out of the blue fytb." A few hours later, at 1:15 a.m., JACKSON texted T.M. "Yoooooo," and T.M. responded, "You niggas was supposed me dub me last night." GOODMAN's cellular telephone internet search history reflected searches for tire repair locations on May 4, 2023, at 10:22 p.m. GOODMAN also had a note reminder to "turn your phone off" on May 6, 2023, at 2:07 a.m.

79.    On May 6, 2023, the day of the murder, at 4:47 a.m., the phone linked to JONES texted JACKSON and asked, "Yo sis kan u see if my klip is in the ride." JACKSON replied that she thinks it could be under the seat. At 10:31 a.m., JACKSON texted the group chat containing nineteen participants, including GOODMAN, LANGLEY, and CARNEY, "DO NOT TEXT IN THIS GX BY ANY MEAN DELETE THIS GX UNTIL FURTHER NOTICE."

80.    The phone linked to JONES sent text messages to LANGLEY at 1:44 p.m. on May 6, 2023, stating "Ma shook right now." The phone linked to JONES asks LANGLEY what they are going to do, and LANGLEY replies that they are "waiting on 5." JONES states that "this shit not it bl21d."

81.    After the murder, several of the suspected perpetrators conducted web searches consistent with consciousness of guilt. Specifically, LANGLEY's cellular telephone searched for "Yorktown News" multiple times on May 6, 2023, at approximately 2:54 p.m. At approximately 2:55 p.m., LANGLEY viewed a news story with the title "25-year-old woman's body found along Old Williamsburg Rd. in Yorktown area" and viewed the same story again at 3:25 p.m. At

17

approximately 5:22 p.m., the phone showed a Google search conducted for "how do I turn off my location."

82.     Similarly, JACKSON's cellular telephone made several web searches on May 6, 2023, between 1:21 and 1:54 p.m. for "richmond news," "body found in York county, va," "breaking news yorktown, va," "Shooting in Yorktown Va yesterday," "Shooting in Yorktown VA today," "Yorktown news," and "Yorktown News, Va." From 1:54 to 1:56 p.m., JACKSON's phone also viewed a website for local crime news in Richmond and an NBC news article titled "Investigation underway after missing woman's body found in York County woods."

83.     A search of CARNEY's cellular telephone showed that at 1:29 p.m. on May 6, 2023, CARNEY's phone made several searches for "richmond va new channel." On May 9, 2023, CARNEY appeared to be reaching out to a contact named "harrelltimothy8" about trying to "disappear." His phone received a text message from the contact, stating: "Whoop… Pardon my soul for the late response..so I don't have any place that you can be low and Hustle..if you need to disappear I can help but if you're trying to trap as well.. I don't have that for you One."

## L.  Identification of the TARGET ACCOUNTS

84.     As noted above, members of the YPSO recovered GOODMAN, JACKSON, and LANGLEY's cellular telephones during the May 7, 2023, traffic stop, and search of the Hyundai Sonata and CARNEY's phone recovered from his possession when he was arrested on May 10, 2023. These phones were searched pursuant to a state authorized search warrant.

85.     A forensic examination of CARNEY's cellular phone revealed an email address containing CARNEY's middle and last names: **JANILECARNEY@GMAIL.COM ("TARGET ACCOUNT 1")**. CARNEY was receiving emails from that account on his cellular phone. Subscriber records show that **TARGET ACCOUNT 1** lists the Google account name as "King Me." **TARGET ACCOUNT 1**'s recovery SMS phone number ends in 8758, which is the number listed in CARNEY's phone that was seized by law enforcement during his arrest. **TARGET ACCOUNT 1** was created on June 5, 2021, and had activated Google services including Gmail, Web & App Activity, Google Calendar, and Google Hangouts.

86.     A forensic examination of GOODMAN's cellular phone showed an email address connected to the phone containing a shortened version of GOODMAN's monicker "Hennesy": **HENNIDABRAT@GMAIL.COM ("TARGET ACCOUNT 2")**. This email address is also connected to GOODMAN's Facebook account and cellular telephone. Subscriber records for **TARGET ACCOUNT 2** show that the Google account name is "Donnisha Goodman." GOODMAN did not provide a recovery SMS phone number. **TARGET ACCOUNT 2** was created on March 6, 2021, and had activated Google services including Gmail, Location History, and Web & App Activity.

87.     A forensic examination of JACKSON's cellular phone showed an email address connected to the phone with JACKSON's first and last name: **JACKSONACACIA2004@GMAIL.COM ("TARGET ACCOUNT 3")**. JACKSON was

18

receiving emails from that account on her cellular telephone. Subscriber records for **TARGET ACCOUNT 3** show that the Google account name was "Acacia Jackson." JACKSON provided a recovery SMS phone number ending in 4501. [4] **TARGET ACCOUNT 3** was created on August 8, 2019, and had activated Google services including Gmail, Location History, and Web & App Activity.

88.    A forensic examination of LANGLEY's phone showed an email address connected to the phone with LANGLEY's first and last name: **JAMICALANGLEY@GMAIL.COM** ("**TARGET ACCOUNT 4**"). LANGLEY was receiving emails from that account on her cellular telephone. **TARGET ACCOUNT 4** lists a Google account name as "Jamica Langley." The recovery SMS phone number for **TARGET ACCOUNT 4** ends in 9329. A law enforcement database search of the cellular telephone number ending in 9329 shows that it is subscribed in the name of "J Langley" and was lasted used between April 2022 and November 2022. **TARGET ACCOUNT 4** was created on November 25, 2019, and had activated Google services including Gmail, Location History, and Web & App Activity. **TARGET ACCOUNT 4** also had access to Google Pay services, with a listed name of "Jamica Langley" and a date of birth of May *, 1999, which is LANGLEY's date of birth. **TARGET ACCOUNT 4** also had a listed postal address of **** Saint John Street, Apartment A, Richmond, VA, which is the listed address of LANGLEY in law enforcement database searches. The postal address also contained a recipient name of "Jamica Langley."

89.    A forensic examination of JONES' cellular phone showed an email address connected to the phone with JONES' first name: **JAYQUAN0123@GMAIL.COM** ("**TARGET ACCOUNT 5**"). JONES was receiving emails from that account on his cellular telephone. **TARGET ACCOUNT 5** lists a Google account name as "Jayquan Jones." **TARGET ACCOUNT 5** has a recovery SMS phone number ending in 7374. A law enforcement database search of the cellular telephone number ending in 7374 shows that it is subscribed in the name of "Jayquan A. Jones" and was lasted used in August of 2022. **TARGET ACCOUNT 5** was created on April 10, 2014, and had activated Google services including Location History, Google Photos, Google Drive, and Web & App Activity. **TARGET ACCOUNT 5** also had access to Google Pay services, with a listed name of "Jayquan Jones" and a listed postal address of **** Saint John Street, Apartment A, Richmond, VA. JONES and LANGLEY are siblings, and both have the same listed address.

90.    On March 1, 2024, law enforcement submitted preservation request #54267715 to Google to preserve all records associated with **TARGET ACCOUNTS 1 through 4**. On March 8, 2024, law enforcement submitted preservation request #54778423 for **TARGET ACCOUNT 5**.

91.    Based on my training and experience, as well as my knowledge of technology regarding Google services, there is probable cause to believe that the **TARGET ACCOUNTS**

---

[4] A law enforcement database search of this number shows that it has not been subscribed in JACKSON's name. However, JACKSON's cell phone records show that she changed her number the day before the murder, and I have reason to believe that several of her co-conspirators have changed their phone numbers frequently in the past several years. Therefore, paired with the other information tying JACKSON's information to **TARGET ACCOUNT 3**, there is probable cause to believe that this account belongs to JACKSON.

19

contain evidence of the criminal activity of **CARNEY**, **GOODMAN**, **JACKSON**, and **LANGLEY**.

92.    There is reason to believe that the defendants used Google features in order to affect the kidnapping of T.M.  This is borne out in the cellular phone extractions that investigators obtained from devices seized from the defendants.  As noted above, the defendants researched news about the murder of T.M. and how to turn their phones off by conducting Google web searches.

93.    Additionally, CW-3 provided sworn testimony that the group used a GPS navigational application on GOODMAN's phone to travel from Richmond to the scene of the murder in York County, Virginia.  Google Maps is a common such service and can provide users with turn-by-turn directions from one location to another using a range of transportation options.

94.    Specifically, based on my training and experience, and all of the facts and opinions set forth in this affidavit, I believe that the **TARGET ACCOUNTS** may contain location information that would reveal the defendants location in and around the area of T.M.'s kidnapping and murder, as well as other information concerning the defendants and their use of Google services, such as account access information, email transaction information, historical location, and account application information.

FURTHER YOUR AFFIANT SAYETH NOT.

Daniel F. Woloszynowski II,
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

20

Sworn and subscribed to me before this 9th day of April 2024

_____
ROBERT J. KRASK
UNITED STATES MAGISTRATE JUDGE

SEEN AND APPROVED

_____
Lisa R. McKeel
D. Mack Coleman
Assistant United States Attorneys
Alyssa Levey-Weinstein
Special Assistant United States Attorney

21

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the following Google Accounts that is stored at premises owned, maintained, controlled, or operated by Google LLC and Google Payment Corporation, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California:

a. JANILECARNEY@GMAIL.COM ("TARGET ACCOUNT 1")
b. HENNIDABRAT@GMAIL.COM ("TARGET ACCOUNT 2")
c. JACKSONACACIA2004@GMAIL.COM ("TARGET ACCOUNT 3")
d. JAMICALANGLEY@GMAIL.COM ("TARGET ACCOUNT 4")
e. JAYQUAN0123@GMAIL.COM ("TARGET ACCOUNT 5")

22

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to be disclosed by Google LLC and Google Payment Corporation ("Google")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs or information that has been deleted but is still available to Google, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on March 1, 2024 and March 8, 2024 with Google Reference Numbers 54267715 and 54778423, Google is required to disclose to the government for each account listed in Attachment A the following information from March 1, 2023, through July 31, 2023, unless otherwise indicated:

a.  All business records and subscriber information, in any form kept, pertaining to the Account, including:

1.  Names (including subscriber names, user names, and screen names);
2.  Addresses (including mailing addresses, residential addresses, business addresses, and email addresses, including alternate and recovery email addresses);
3.  Telephone numbers, including SMS recovery and alternate sign-in numbers;
4.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including log-in IP addresses;
5.  Telephone or instrument numbers or other subscriber numbers or identities, including any temporarily assigned network address, SMS recovery numbers, Google Voice numbers, and alternate sign-in numbers
6.  Length of service (including start date and creation IP) and types of service utilized;
7.  Means and source of payment (including any credit card or bank account number);
8.  Change history.
9.  All cookie and user-specific advertising data, including third-party cookies;
10. Logs of access, activity, deletion, and change;
11. Accounts associated by cookie, SMS number, recovery email, or IP address;
12. Google play store records of applications purchased or installed on a particular device;
13. Device records.

b.  All device information associated with the Account, including but not limited to, manufacture names, model numbers, serial number, media access control (MAC) addresses, international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, and telephone numbers;

c.  Records of user activity for each connection made to or from the Account(s), including, for all Google services, the date, time, length, and method of connection, data transfer volume, user names, source and destination IP address, name of accessed Google service, and all activity logs;

1. **Gmail**: The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, and deleted emails; attachments; the source and destination addresses associated with each email; the size, length, and timestamp of each email; true and accurate header information including the actual IP addresses of the sender and recipients of the emails; and all forwarding or fetching accounts relating to the accounts.

2. **Contacts**: Any records pertaining to the user's contacts, including: address books; contact lists; social network links; groups, including Google Groups to which the user belongs or communicates with; user settings; and all associated logs and change history.

3. **Calendar**: Any records pertaining to the user's calendar(s), including: Google Calendar events; Google Tasks; reminders; appointments; invites; and goals; the sender and recipients of any event invitation, reminder, appointment, or task; user settings; and all associated logs and change history.

4. **Messaging**: The contents of all text, audio, and video messages associated with the account, including Chat, Duo, Hangouts, Meet, and Messages (including SMS, MMS, and RCS), in any format and however initially transmitted, including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size, length, and timestamp of each communication; user settings; and all associated logs, including access logs and change history.

5. **Google Drive and Keep**: The contents of all records associated with the account in Google Drive (including Docs, Sheets, Forms, and Slides) and Google Keep, including: files, folders, media, notes and note titles, lists, applications for Android users, and other data uploaded, created, stored, or shared with the account including drafts and deleted records, and third-party application data and backups and SMS data and device backups for Android users; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device, other Google service (such as Google Classroom or Google Group), or third-party application associated with each record; and all associated logs, including access logs and IP addresses, of each record.

6. **Google Photos**: The contents of all media associated with the account in Google Photos, including: photos, GIFs, videos, animations, collages, icons, or other data uploaded, created, stored, or shared with the account, including drafts and deleted records; accounts with access to or which previously accessed each record; any location, device, or third party application data associated with each record; and all associated logs of each record, including the creation and change history, access logs, and IP addresses.

7. **Google Maps**: All maps data associated with the account, including Google Maps and Google Trips, including: all saved, starred, and privately labeled locations; search history; routes begun; routes completed; mode of transit used for directions; My Maps data; accounts and identifiers receiving or sending Location Sharing information to the account; changes and edits to public places; and all associated logs, including IP addresses, location data, and timestamps, and change history.

8. **Google Location History**: All Location History and Web & App Activity indicating the location at which the account was active, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car), and associated logs and user settings, including Timeline access logs and change and deletion history.

9. **Google Pay**: All payment and transaction data associated with the account, such as Google Pay and Google Wallet, including: records of purchases, money transfers, and all other transactions; address books; stored credit; gift and loyalty cards; associated payment cards, including any credit card or bank account number, PIN, associated bank, and other numbers; and all associated access and transaction logs, including IP address, time stamp, location data, and change history.

10. **Chrome and My Activity**: All Internet search and browsing history, and application usage history, including Web & App Activity, Voice & Audio History, Google Assistant, and Google Home, including: search queries and clicks, including transcribed or recorded voice queries and Google Assistant responses; browsing history, including application usage; bookmarks; passwords; autofill information; alerts, subscriptions, and other automated searches, including associated notifications and creation dates; user settings; and all associated logs and change history.

11. **Google Play**: All activity relating to Google Play, including: downloaded, installed, purchased, used, and deleted applications; details of the associated device and Android ID for each application, medium, or file; payment transactions; user settings; and all associated logs, including IP addresses, timestamps, and change history.

12. **Google Voice**: All Google Voice records associated with the account, including: forwarding and other associated telephone numbers, connection records; call detail records; SMS and MMS messages, including draft and deleted messages; voicemails, including deleted voicemails; user settings; and all associated logs, including access logs, IP addresses, location data, timestamps, and change history.

13. **YouTube**: All YouTube content associated with the account, including shared or uploaded videos, change history, comments, playlists, subscriptions, searches, likes, and watch history.

Google is hereby ordered to disclose the above information to the government within 14 days of the issuance of this warrant, via United States mail, courier, or email to the following law enforcement agent:

Special Agent Daniel F. Woloszynowski
Bureau of Alcohol, Tobacco, Firearms
and Explosives
Washington Field Division
Newport News Field Office
200 Granby Street,
Suite 339, Norfolk, VA
23510
Telephone: (757) 974-3502
Email:Daniel.woloszynowski2@atf.gov

**II.    Information to be Seized by the Government**

a.    All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 1201(c) (Conspiracy to Commit Kidnapping) and 18 U.S.C. § 1201(a)(1) (Kidnapping Resulting in Death), involving **HEZEKIAH CARNEY, DONNISHA GOODMAN, ACACIA JACKSON, JAYQUAN JONES,** and **JAMICA LANGLEY,** between March 1, 2023, through July 31, 2023, including, for each account listed on Attachment A and for the accompanying dates, information pertaining to the following matters:

b.    Evidence indicating how and when the accounts were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

c.    The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

d.    The identity and whereabouts of coconspirators, accomplices, and aiders and abettors in the commission of the criminal activity under investigation.

e.    Information reflecting the planning or execution of a kidnapping, including the acquisition of a firearm or ammunition;

f.    Information reflecting the use of mapping applications for directions to/and from the location of a kidnapping or acquisition of a firearm or ammunition; and

g.    Information about the gang-related activities of the Black P. Stones.

h.    Information about any racketeering predicates of the Black P. Stones, including drug trafficking, robberies, murders, or other predicates thereof.

i.    All images, messages communications, and contacts, including any and all preparatory steps taken in furtherance of the SUBJECT OFFENSES or to evade detection or apprehension after their commission.

j.    Any contextual information necessary to understand the evidence described in this Attachment B.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.